Aubrey B. LANK, as Receiver of Pickard & Company, Incorporated, Plaintiff,

v.

The NEW YORK STOCK EXCHANGE, Defendant.

No. 71 Civ. 5525.

United States District Court,
S. D. New York.

Dec. 29, 1975.

**1032**

Spengler, Carlson, Gubar & Churchill, New York City, for plaintiff; Robert S. Carlson, J. Edward Meyer, III, Gregory Katz, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant; Russell E. Brooks, New York City, of counsel.

LASKER, District Judge.

Aubrey B. Lank (Lank) sues the New York Stock Exchange (the Exchange) as Receiver of Pickard & Company, Incorporated (Pickard), a defunct brokerage firm which was a member of the Exchange prior to its liquidation in the Spring of 1968. The complaint alleges violation of Section 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f,[1] and seeks damages in excess of $2,-000,000., a sum comprised of amounts lost both by Pickard and by various creditors of Pickard when the corporation went under. The Exchange counterclaims for expenses it incurred in the liquidation of Pickard, for amounts expended by its Special Trust Fund to meet Pickard's obligations to its customers and, as a general creditor of Pickard, the Exchange counterclaims against Lank, personally, for waste of corporate assets in pursuing this litigation.

The Exchange moves to dismiss the complaint and for summary judgment on its counterclaims.

The decision to liquidate Pickard was made in May, 1968, after a routine audit revealed substantial deficiencies in its books and records and Exchange employees had unsuccessfully attempted to put the books in order. The Exchange appointed its Chief Examiner, Lloyd W. McChesney, as Liquidator to take control of the company and wind up its business. Pickard executed agreements with the Exchange to reimburse it and its Special Trust Fund for certain expenses incurred in the liquidation and for sums paid to protect Pickard's customers against loss. The agreements provide the basis for the Exchange's counterclaims here.

Accountants, Exchange employees and the Liquidator uncovered evidence of serious wrongdoing by certain officers

1. The complaint also contains common law counts of fraud, negligence and breach of contract. These issues have no bearing on the present motion because the Exchange has limited its attack to the federal claim. If the Exchange is successful, of course, this court will lose jurisdiction over the other counts which are asserted on the basis of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

and employees of Pickard. The President and Vice President of the corporation, John and Peter Sackville-Pickard, were found to have withdrawn in excess of $650,000. of Pickard's funds without the knowledge of the other officers and directors. They were also found to have participated in numerous violations of the securities laws and rules and regulations of the Exchange.[2] The Pickard brothers were expelled from the Exchange and their registrations were revoked and lesser disciplinary action was taken against other officers and directors.

In March, 1969, the Exchange petitioned the Delaware Court of Chancery (Pickard is a Delaware corporation) for the appointment of a receiver. According to the affidavit of McChesney submitted in support of the Delaware receivership petition, Pickard's obligations to its customers had been fulfilled and the only remaining general creditors were the Exchange and its Special Trust Fund, whose claims were based on the agreements to reimburse them executed by Pickard at the outset of the liquidation;[3] the only other claimants of Pickard's assets were the subordinated lenders and stockholders.

Lank was duly appointed Receiver by the Delaware Court in late April, 1969. On December 17, 1971 he filed this action.[4] The thrust of the complaint is that the Exchange knew or should have known as early as October, 1966 that Pickard was in violation of its net capital and other rules and that if the Exchange had fulfilled its obligations under § 6 to enforce compliance with the securities laws and its own rules, the losses suffered by Pickard's customers, subordinated lenders, shareholders and creditors who advanced money subsequent to October, 1966 would have been prevented.

As stated above, the Exchange moves to dismiss the complaint and for summary judgment on its counterclaims. The motion to dismiss alleges lack of prosecution (Rule 31(b)), lack of capacity as Receiver to raise these claims (Rule 12(b)(6)) and that the action is time barred (Rule 12(b)(6)). Summary judgment on the first and second counterclaims is sought on Pickard's contractual obligation to reimburse the Exchange and its Special Trust Fund and on the third counterclaim because this action is so patently unmeritorious as to constitute a waste of corporate assets. For the reasons which follow, the motion to dismiss for lack of capacity is granted in part, summary judgment is granted as to liability on the first two counterclaims, and the motion is denied in all other respects.

## I.

The motion to dismiss for failure to prosecute is based on the fact that

---

2. The complaint against Messers. Pickard in an SEC proceeding charged them

"with selling unregistered stock, with manipulation of the market, with effecting transactions through dummy accounts, with making untrue and deceptive and misleading statements, with unlawfully extending and maintaining credit to customers in violation of Regulation T, with failing to keep accurate current records and accounts, with wrongfully comingling customers' securities without their prior consent and wrongfully hypothecating such securities, with failing to file a certified report of Pickard's financial condition for the calendar year 1967 within the time required, and with other violations of the Securities Laws."

(Affidavit of Lloyd W. McChesney, ¶ 26, attached as Exhibit A to the Bishop Affidavit, March 3, 1975.)

3. Lank disputes the Exchange's contention that it is the only remaining unpaid general creditor of Pickard, asserting that there are approximately 30 others, whose claims are in excess of $100,000. (Lank Affidavit, ¶ 8, April 21, 1975).

4. It should be noted that Lank originally sought to assert his present claims as counterclaims against the Exchange in the Delaware receivership proceeding in the Spring of 1971. On September 20, 1971, however, the Chancellor decided that he lacked jurisdiction to consider the matter in view of his conclusion that "a fair reading of the counterclaim shows that it is based on Section 6 of the Securities Exchange Act of 1934." *New York Stock Exchange v. Pickard & Company*, 282 A.2d 651, 652 (Del.Ch.1971).

apart from a request for production of documents filed in early 1972, Lank took no action in the litigation from its inception, in December, 1971, until February 1975.

The long period of inertia did not go unnoticed by the court. In fact, on February 11, 1975 we filed an order statistically closing the case.[5] This action prompted a letter from Lank's counsel in which he represented that the reason for the inactivity was an agreement between the parties not to press the litigation because of a related pending arbitration proceeding. He informed the court that there was also another related case pending between the same parties in the Southern District of New York and that he expected rapid settlement of both cases upon the conclusion of the arbitration. He requested that the case be restored to the docket lest prejudice to the overall settlement be incurred and his request was granted.

The Exchange takes issue with this explanation for the delay. It denies knowledge of any related suit between the parties[6] and flatly denies the existence of an understanding not to litigate the case.

A close reading of the affidavits of Lank's counsel, J. Edward Meyer, III, reveals that apart from his initial letter to the court requesting that the case be reactivated, he never directly avers that an agreement to settle was reached. Rather, he asserts that after discussions with attorneys for the Exchange, he concluded that the case would be settled by an exchange of releases at the close of the arbitration. To rebut Meyer's contention, or intimation, of an agreement to settle, the Exchange attorneys have submitted a copy of a letter dated

March 3, 1972 from Meyer's partner which appears to reject a settlement offer and demand that the litigation be commenced in earnest. Meyer, in turn, produced a letter from him to the court dated July 17, 1973, a copy of which was sent to the opposition, in which he represented his belief that the case would be settled at the conclusion of the arbitration.

The affidavits and exhibits submitted in connection with this motion suggest that, at best, a rather serious misunderstanding existed as to the status of this litigation. We confess some surprise that Meyer would jeopardize a claim he alleges to be worth two million dollars on the strength of an unwritten agreement to settle at some indeterminate future date, much less on a hunch that the Exchange would settle if he simply lay low for several years. On the other hand, the very fact of his inactivity can be viewed as evidence of a good faith belief on his part that an agreement to settle had been made. Further, his letter to the court of July, 1973, indicates that the Exchange attorneys had notice of Meyer's expectation of settlement and, thus, they must share some, though clearly not equal, culpability for the unconscionable delays.

Having taken note of the regrettable behavior of Lank's attorneys, however, we also note that they have made substantial allegations of misfeasance by the Exchange which ought to be determined on the merits rather than because of attorney dalliance. See generally *Link v. Wabash Railroad Co.*, 370 U.S. 626, 643–49, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (Black, J., dissenting). Moreover, litigation concerning the demise of Pickard has been in process for a good part of the period of delay, see *Lansing v.*

5. A directive from the Administrative Office of the United States Courts allows a District Court to statistically close cases which have been pending for more than three years in which no action has been taken for a period of 12 months.

6. No other case in this district or elsewhere between these parties has been called to the

court's attention. There has been other litigation based on Pickard's collapse, however, *Lansing v. New York Stock Exchange*, 68 Civ. 2872 (S.D.N.Y. July 9, 1973) (Bonsal, J.); and Lank and the Exchange are both defendants in an action filed last April currently pending before this court. *Fischer v. New York Stock Exchange*, 75 Civ. 1638.

*New York Stock Exchange,* note 6, *supra,* and there is thus no indication of any serious prejudice to the Exchange by way of lost records or witnesses having to recall matters eight years past which have been long since forgotten. In short, the circumstances do not warrant the drastic sanction sought by the Exchange, and accordingly the motion to dismiss the complaint under Rule 41(b) is denied.

The Exchange maintains that Lank is attempting to assert the claims of creditors, subordinated lenders and stockholders of Pickard, that as Receiver of Pickard he lacks capacity to do so, and that even if he could sue on behalf of those parties he still lacks standing because the Exchange's duty under § 6 runs only to public customers of Pickard. We agree that Lank lacks capacity to prosecute claims of third parties against the Exchange and to the extent that the complaint, in addition to asserting the to dismiss is granted. However, the complaint in addition to asserting the claims of third parties, also asserts a claim on behalf of Pickard. Insofar as it does, the complaint states a valid claim for relief under § 6.

 The purpose of a statutory receiver is "to preserve, collect, administer and distribute the property of a corporation." 2 Clark, *Receivers* § 578 (3rd ed. 1959). To effectuate these aims, a receiver is empowered, among other things, to bring suit on behalf of the corporation,[7] but in Delaware, as elsewhere, it is generally held that a receiver occupies no better position than the corporation and can only assert claims which the corporation could have asserted. *Bovay v. H. M. Byllesby & Co.,* 26 Del.Ch. 69, 78, 22 A.2d 138, 142 (1941); 16 Fletcher, *Cyclopedia of Corporations,* § 7847 at 463 (1962 ed.); 2 Clark, *Receivers* § 578(b) (3d ed. 1959, Supp. 1968–69). The other side of the coin is that a receiver may not assert claims which belong to third parties and not to the corporation. *Rockwood v. Foshay,* 66 F.2d 625, 630 (8th Cir. 1933) (applying Delaware law); *Cotton v. Republic National Bank of Dallas,* 395 S. W.2d 930, 941 (Tex.Civ.App.1965); *Kennedy v. Fidelity & Deposit Co.,* 153 Or. 646, 58 P.2d 625 (1936).; 16 Fletcher, *Cyclopedia of Corporations,* § 7849 at 467 (1962 ed.).

The parties do not seriously dispute the law. They differ, rather, in their characterization of Lank's complaint. The Exchange maintains that the action is brought solely on behalf of "customers, creditors, subordinated lenders and stockholders of Pickard" (Brief in Support of Motion at 12, March 31, 1975) and that Lank, as Receiver, lacks capacity to do so. Lank, on the other hand, steadfastly asserts that he is properly asserting only a corporate claim. (See Brief in Opposition at 13, April 24, 1975).[8]

7. The Delaware statute which defines the powers of an insolvency receiver expressly authorizes him to:

"take charge of [the corporate] assets . . . and to collect the outstanding debts, claims and property due and belonging to the corporation, with power to prosecute and defend . . . all claims or suits . . . and to do all other acts which might be done by the corporation." 8 Del. Code Ann. § 291 (1975).

The order of the Delaware Court appointing Lank the Receiver of Pickard tracks the language of the statute. (Exhibit A, Lank Affidavit, April 25, 1975).

8. In fact, Lank's position as elaborated in his brief is somewhat opaque. If our conclusion that he does not seriously dispute the law is incorrect, then we believe that the authorities cited above demonstrate clearly that his position cannot withstand scrutiny. Moreover, in view of the apparent concession made by the Exchange in the Delaware Court proceedings, see *New York Stock Exchange v. Pickard & Co., Inc.,* Civ.Action #29997 (Del.Ch., Oct. 9, 1972) (Ex. G, Lank Affidavit) discussed more fully at V, infra, that this action is at least partly brought on behalf of the corporation, (a position consistent with the conclusion we reach today) the more rigid position taken on this motion is puzzling. It serves only to obscure the issue for determination here and exhaust precious judicial time in the determination of this motion.

■ Lank's position in this regard is somewhat disingenuous. The complaint is remarkably obscure as to the precise nature of the claim. Averments of the duties of the Exchange to and the damage sustained by Pickard's customers, creditors, subordinated lenders and shareholders are liberally sprinkled throughout. (Complaint ¶¶ 15, 22, 23, 28, 31, 34, 35, 36) In fact, there are considerably fewer explicit references to duties or damages to Pickard itself. (Complaint, ¶¶ 15, 22, 31, 36) The only concrete indication as to whose claims Lank is attempting to recover upon is in the prayer for relief which reads:

"36. By reason of the foregoing, plaintiff demands judgment against the Exchange for (a) the sum of $269,648.00 paid to the Exchange out of the proceeds of the sale of Pickard's membership in the New York Stock Exchange, plus interest; (b) the sum of $99,650.00 paid by Pickard on February 19, 1969 to the Special Trust Fund of the Exchange, plus interest; (c) the sum of $1,032,220.00 representing all sums advanced by subordinated lenders to Pickard subsequent to October, 1966, plus interest; (d) the sum of $205,126.27 representing all sums due general creditors of Pickard, plus interest; (e) the sum of $466,071.67 representing sums paid by purchasers of shares of stock of Pickard subsequent to October, 1966; and (f) costs plus Receiver's and attorneys fees."

The language of (c)–(e) belies Lank's pretense of asserting Pickard's claims alone. In those phrases he is manifestly seeking the full amount of the damages of Pickard's creditors, subordinated lenders and stockholders.[9] These are damages sustained by third parties and not by the corporation and he therefore must be held, to that extent, to be asserting their claims. We agree with

the Exchange that he lacks capacity to do so. Cf. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).

■ This conclusion, however is not the end of the matter, because it is also clear, from (a)–(b) of the quoted language, that Lank seeks damages properly attributable to the corporation as well. The proceeds from the sale of Pickard's seat on the Exchange and money paid by Pickard in partial satisfaction of its obligation to reimburse the Special Trust Fund are clearly assets of the corporation lost as a result of Pickard's demise. They would seem to be properly recoverable by a receiver if the Exchange is legally responsible to the corporation for that demise.

The question thus becomes whether Pickard has a cause of action against the Exchange under § 6 of the Securities Exchange Act upon which the receiver may sue. The Exchange takes the position that its duties under § 6 run only to public customers of Exchange members and that in any event, Lank, as Receiver of Pickard, would have no authority to assert such a claim because Pickard was the primary wrongdoer in the whole affair. To allow the Receiver, i. e. the corporation, to bring this action would be "tantamount to permitting the robber to sue the policeman for not catching him before he had a chance to rob." (Reply Brief at 30; April 29, 1975)

In *New York Stock Exchange v. Sloan*, 394 F.Supp. 1303 (S.D.N.Y.1975) this court considered and rejected the general proposition that the Exchange's duties under § 6 run only to public customers, ruling that limited partners and subordinated lenders of a defunct brokerage house, a partnership, had standing to assert § 6 claims against the Exchange based in part on its failure to

---

9. Cf. *Buttrey v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 137 (7th Cir. 1969), where the court allowed a trustee in bankruptcy to maintain a § 6 action on behalf of the bankrupt corporation, not-

ing that "The trustee is not seeking to recover the full amount of the claims of the bankrupt's customers but only the net amount of the transfers by the bankrupt to [the] defendant."

enforce compliance with the net capital rule.

"[The net capital rule], which relate[s] to the financial soundness of member firms, [is] manifestly intended to protect those who entrust their funds or securities to broker-dealers, and who stand in the kind of relationship to the firm which requires them to rely on its compliance with the rules. The *Baird* court [*Baird v. Franklin*, 141 F.2d 238 (2d Cir.) *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944)] found that public customers clearly fall into this category; in our view, the same rationale applies to limited partners and subordinated lenders . . . No matter how their investment in the firm is characterized they clearly have a large stake in the enforcement of the rules. Because their status requires them to rely on the general partners both to manage the enterprise and to comply with the net capital . . . rules, they are entitled to the Exchange's diligent enforcement of [it]." 394 F.Supp. at 1310–11.

The same reasoning supports an action by a corporation, at least where, as here, the action is asserted by a receiver in liquidation. A corporation, like the customers, subordinated lenders and limited partners of a brokerage firm, is required by its status to rely on those responsible for the management of the firm to comply with the net capital rule and is therefore entitled to the Exchange's diligent enforcement. A brokerage corporation as an entity is more than its officers and directors. It is also capable of sustaining damages as a result of violations of the securities laws and regulations and the rules of the Exchange by those charged with its day to day control. In such circumstances a corporation is entitled to the benefits and protection of § 6 and has standing to sue accordingly.

The Exchange's argument that Lank cannot bring suit because Pickard was

the primary wrongdoer is an oversimplification. Although as a general rule a receiver is, of course, subject to the same defenses as the corporation, there is ample authority for giving a receiver power to sue where the corporation could not in a case where the corporation would be denied recovery because of officers' participation or involvement in wrongdoing. It is well settled, for instance, that where a corporation has transferred funds in fraud of its creditors, the receiver may maintain an action against persons to whom the transfers were made to enforce the rights of the corporation and its creditors and recover the funds even though the corporation could not do so. *Bovay v. H. M. Byllesby & Co., supra; Keedy v. Sterling Electric Appliance Co.,* 13 Del.Ch. 66, 115 A. 359, 363 (1921); 16 Fletcher, *Cyclopedia of Corporations,* §§ 7810 at 401–02; 7847 at 465–67 (1962 ed.). It is in this sense, and only this sense, that a receiver is said to "represent not alone the corporation . . . but as well the interests of all creditors." *Keedy v. Sterling Electric Appliance Co., supra,* 115 A. at 363. This is not inconsistent with our conclusion that Lank may not sue to collect the damages sustained by the creditors. He "represents" these third parties' interests not by suing on their claims to recover the full amounts of the damages they suffer, but by suing to recover corporate damages. To say that he is enforcing the creditors' rights is simply to say that in accordance with his statutory mandate, see note 7, *supra,* he is attempting to maximize the pool of corporate assets in order to satisfy the corporation's obligations to the greatest extent possible. This long standing rule which applies to fraudulent transfers of corporate assets appears especially suitable to the case at hand. In both instances the defendants bear responsibility for the loss to the corporation and those who would benefit from the suit bear none.[10]

10. We, of course, express no opinion on the merits of Lank's case. For purposes of this motion we accept as true the allegations of the complaint.

Courts have not hesitated to grant trustees in bankruptcy a right of action under § 6. In *Pettit v. American Stock Exchange,* 217 F.Supp. 21 (S.D.N.Y. 1963) the corporate reorganization trustee of a corporation alleged to have been defrauded of 587,000 shares of its stock through the facilities of Amex in a rigged market was allowed to assert a § 6 claim against Amex over the defendant's objection that the damage to the corporation stemmed primarily from the wrongdoing of corporate insiders. 217 F.Supp. at 29. The Court of Appeals for the Seventh Circuit similarly allowed a trustee in bankruptcy of a securities dealer to bring a § 6 action based on a violation of the "Know Your Customer" rule. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (7th Cir.) *cert. denied,* 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969). There the court held that the trustee, by virtue of his authority under §§ 70e and 60e of the Bankruptcy Act, 11 U.S. C. § 110(e) and 96(e), could attempt to recover customers' funds converted by the bankrupt's principal and placed in an account with the defendant. Of course, since *Buttrey* involved an issue of the bankruptcy trustee's statutory authority under the Bankruptcy Act it is not directly applicable in the instant case. But it does support the proposition that a trustee in bankruptcy, or a receiver,[11] should be allowed to employ all the legal tools at his command to pursue assets and claims of the corporation against those who share some legal responsibility for the corporation's downfall. The *Buttrey* court explicitly rejected the contention that the trustee was barred from recovery by the responsibility of the bankrupt's principal for the illegal transaction. 410 F.2d at 139.

Finally, and closest on its facts to the case at hand, in *Seligson v. New York Produce Exchange,* 378 F.Supp. 1076 (S.D.N.Y.1974), the court allowed the trustee in bankruptcy of a brokerage firm to bring an action against the New York Produce Exchange for violation of its duties under the Commodities Exchange Act to maintain an orderly market. The court rejectd the plaintiff's reliance on *Buttrey* to defeat the defense of *in pari delictu* because in *Seligson* the trustee's action was brought under §§ 70(a)(5) and 70(a)(6) of the Bankruptcy Act, 11 U.S.C. §§ 110(a) (5), 110(a)(6), under which the trustee is subject to the same defenses as the corporation. This, of course, is the Exchange's position with regard to Lank's authority as Receiver. 378 F. Supp. at 1085–86. Nevertheless, the court disallowed the defense as contrary to the policy of the Commodities Exchange Act, which places heavy reliance on enforcement and self-regulation by the Commodities Exchange for the protection of investors. 378 F.Supp. 1085–86. A similar policy underlies the Securities Exchange Act,[12] see *New York Stock Exchange v. Sloan, supra,* 394 F. Supp. at 1310, although the obligations of the Securities Exchanges are not as broad as those of the former. *Id.,* 394 F.Supp. 1315 n. 16. Despite the similarity of the two Acts, and partially because of this disparity of responsibility, we declined in *Sloan* to allow the general partners of a bankrupt brokerage firm to rely on *Seligson* to overcome the *in pari delictu* defense, noting that the general partners shared personal responsibility, if not culpability, for the firm's demise.[13] *Id.* at 1315 and n. 16.

---

11. There is strong similarity between the role of a trustee in bankruptcy and an insolvency receiver in regard to their position vis a vis creditors and stockholders. *Bovay v. H. M. Byllesby & Co., supra,* 22 A.2d at 142.

12. The authorities relied upon in *Seligson* are cases which rejected the *in pari delictu* defense in the context of securities laws viola-

tions. *Pearlstein v. Scudder and German,* 429 F.2d 1136, 1141 (2d Cir. 1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) ; *Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F.Supp. 50 (S.D.N.Y.1971) (Weinfeld, J.).

13. As previously noted, we did allow the limited partners and subordinated lenders in

To hold this reasoning applicable in the instant case because Pickard, like the general partners, was a member of the Exchange, would be to honor form over substance. We have already noted that we find a corporation to possess characteristics distinct from those of the general partners in *Sloan. Supra* at 1036–1037. Moreover, here, as in *Seligson,* the ultimate beneficiaries of any recovery by Lank are third parties who share no culpability for Pickard's wrongdoing and ultimate demise. See *Keedy v. Sterling Electric Appliance Co., supra;* 16 Fletcher, *Cyclopedia of Corporations,* §§ 7810; 7847, *supra.*

## III.

The Exchange also moves to dismiss on the grounds that the action is time barred, asserting that Lank's § 6 claim is governed by the three year statute of limitations of NYCPLR 214(2), the statute governing actions to recover on a liability created by statute. Lank, citing *Weinberger v. New York Stock Exchange,* 335 F.Supp. 139 (S.D.N.Y. 1971), counters that the six year period of NYCPLR 213(2) has been held to govern a § 6 action.

The question is not free from doubt. In the absence of a specific federal statute of limitations, the state statute governs, *Cope v. Anderson,* 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); and where there is no exact state counterpart to the federal claim asserted, the limitations period for the state action most analogous to the federal claim is applied. *International Union United Auto Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 704–06, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). There is appeal to the rather straightforward proposition that an action based on § 6

of the Securities Exchange Act is one which seeks to recover on a liability created by statute and is therefore governed by the three year period. The New York cases which define a "liability created by statute" as one which would not exist but for the statute which created it, see *Frank Shepard Co. v. Zachary P. Taylor Pub. Co.,* 234 N.Y. 465, 138 N.E. 409 (1923); *Bevelander v. Town of Islip,* 10 A.D.2d 170, 199 N.Y.S.2d 561 (2d Dept. 1960) lend support to this position, because there is no common law or state law counterpart to a § 6 suit against the Exchange. *Raldiris v. Simmons,* 242 App.Div. 603, 271 N.Y.S. 1018 (1st Dept. 1934), *aff'd* 266 N.Y. 577, 195 N.E. 208 (1935); *Morgenbesser v. New York Stock Exchange,* CCH Fed.Sec.L.Rep. ¶ 93,210 (Sup.Ct.Nassau Co.1971).

The question, however, is more complex. In *Weinberger v. New York Stock Exchange, supra,* the plaintiff filed a complaint alleging a § 6 violation and the Exchange moved to dismiss the action as time barred under NYCPLR 214(2). The plaintiff then served an amended complaint, which, although alleging the same facts as the original, pleaded a third-party beneficiary contract theory instead of a § 6 violation. The theory was premised on the contract § 6 requires the Exchange to enter into with the SEC, by which the Exchange promises to enforce, to the extent of its powers, compliance by its members with the securities laws and with its rules. *Weinberger v. New York Stock Exchange, supra,* 335 F.Supp. at 140–42. In a closely reasoned and persuasive opinion, Judge Gurfein determined that the third party beneficiary theory stated a valid contract claim,[14] 335 F.Supp. 142–45, and concluded that the action should therefore be governed by the six year

*Sloan* to bring suit against the Exchange based on § 6 in partial reliance on the policy of self regulation of the securities laws. 394 F.Supp. at 1310.

14. Although the idea of a third party beneficiary theory of recovery was not new, see

*Baird v. Franklin,* 141 F.2d 238, 242 & 244 (2d Cir. 1944), *Weinberger* was the first case to explicitly uphold the availability of such a claim. Weinberger was defeated on the merits. *Weinberger v. New York Stock Exchange,* 403 F.Supp. 1020, 69 Civ. 4461 (S.D.N.Y.1975) (Bonsal, J.).

contract limitations period of NYCPLR 213(2). 335 F.Supp. at 145.

The obvious distinction between *Weinberger* and the instant case is that Lank has pleaded a statutory and not a contract theory of recovery. However, it offends common sense and the spirit of the Federal Rules to hold that what is for all practical purposes the identical claim should or should not be time barred because of the wording of the complaint.[15] We find the analysis in *Weinberger* convincing and conclude that actions brought pursuant to § 6 are neither purely statutory or contractual in nature, but a hybrid. The statute requires only that in order to be licensed to do business as a stock exchange the Exchange must contract with the SEC to do certain things.[16] Thus, although the duty has its genesis in the statutory provision, see *People v. Corcillo*, 195 Misc. 198, 88 N.Y.S.2d 534, 535 (Sup. Ct.Albany Co., 1949), *aff'd* 276 App.Div. 675, 97 N.Y.S.2d 319, *leave to appeal denied*, 277 App.Div. 911, 98 N.Y.S.2d 592 (3rd Dept.1950) on close analysis, it is a contractual duty. The Exchange is not required by the statute to do business. Section 6 only describes the nature of a contract which must be made if a license to do business is to be granted. Cf. *People v. Corcillo, supra*, 195 Misc. 198, 199–200, 88 N.Y.S.2d 534, 535–36.

■ Moreover, absent a specifically indicated statute of limitations, a federal court ought not to ignore considerations of federal policy and of justice in determining which statute is to be applied. Cf. *Weinberger, supra*, 335 F.Supp. at 145 and cases cited there. A three year limitation period seems peculiarly inappropriate to a § 6 action. Discovery, or even a hint of past failure of a stock exchange to enforce its rules against a member is unlikely to occur until after disaster has struck and there has been an opportunity to investigate the causes. Any disadvantage to the defendant exchange by the longer period is limited by the institutions' extensive record keeping practices.

■ In sum, we conclude that the provisions of NYCPLR 213(2) should be applied in an action brought under § 6 of the Securities Exchange Act. Since the complaint alleges the Exchange's failure to fulfill its obligations as early as October, 1966 and was filed in December, 1971, Lank's action is not time barred.

### IV.

■ The first and second counterclaims of the Exchange are based on the agreements executed by Pickard by which Pickard undertook to reimburse both the Exchange and the Special Trust Fund for certain expenses incurred in the liquidation (see page 1032–1033, *supra*). On February 13, 1968 Pickard agreed to assume responsibility and liability for all acts and omissions of Exchange employees performing work for Pickard. Three months later, on May 16, it agreed to repay to the Special Trust Fund all sums advanced by the latter to meet Pickard's obligations to its customers and creditors and to reimburse the Exchange for the compensation of the Liquidator and other Exchange employees assigned to work on the liquidation. (Exs. B and C, Bishop Affidavit, March 31, 1975)

15. Even if we did dismiss the complaint we would allow leave to replead, and under Rule 15(c) the amended complaint would relate back to the time of filing of the original.

16. Judge Gurfein rested his analysis in large part on the explicit, and apparently self-conscious, requirement by Congress that as a condition to registration a securities exchange enter an agreement with the SEC. 335 F. Supp. 144–45. We are aware that recent amendments to § 6 have eliminated the statutory requirement of an agreement. (Securities Act Amendments of 1975, Pub.L.No. 94–29, 89 Stat. 104, June 4, 1975). These amendments took effect December 1, 1975, however, and therefore whatever effect they may ultimately have on the third party beneficiary theory of recovery, they have no bearing on this action.

The Exchange has met its burden of showing an absence of genuine issue of material fact on the question of liability, and is entitled to summary judgment on that issue. The affidavit of Robert M. Bishop, Senior Vice President of the Exchange, adequately sets forth the execution of the agreements and the Exchange's performance and expenditure of funds thereunder. Annexed to Bishop's affidavit is the affidavit of the Liquidator in connection with the petition for receivership which sets forth the facts of execution and performance in some detail.

Lank's attempt to show, or rather pretense of showing, a genuine material issue of fact in opposition to the motion amounts to no more than a frivolous effort to raise the spectre of duress in the execution of the May 16 agreement between Pickard and the Exchange. (Lank Affidavit, April 25, 1975; ¶ 9) To support this conjecture, Lank has annexed to his affidavit four pages of a transcript of testimony given by one Gerrit Lansing, a non-voting stockholder and subordinated lender of Pickard, in relation to another proceeding, *Lansing v. New York Stock Exchange, supra,* note 6. The sum and substance of this testimony, read in the light most favorable to Lank, is that in June, 1968, Bishop showed Lansing a discouraging financial statement of Pickard. Bishop then told Lansing that there was little hope of recovering on his subordinated loans and that he was required to sign the May 16 agreement. Lansing declined to do so until he consulted with his lawyer, and, in fact, he never signed it. (Lank Affidavit, April 25, 1975; Ex. E)

Questions of admissibility aside, this transcript falls so far short of raising a genuine factual issue that its inclusion in Lank's papers is an insult to the intelligence of the court. Not only does the fact that Lansing declined to sign refute all inferences of duress, but there is no indication whatsoever that Lansing's signature—or that of any other subordinated lender—was required to validate the agreement which was signed by all the corporate officers and all the voting shareholders of Pickard. Lank nowhere claims that the contract is deficient for lack of the signatures of the subordinated lenders, and indeed, such a claim would appear to controvert hornbook corporate law.

Lank also argues that it would be improper to grant summary judgment since the Exchange has asserted these claims in the receivership proceeding which is still pending. The Delaware Court does not have exclusive jurisdiction of the controversy, however, and the Exchange is hardly barred from asserting a legitimate counterclaim in a federal proceeding brought by Lank.

Finally, Lank contends that the Exchange should be prevented from asserting these claims because it is seeking to profit from its own wrong. (Brief in Opposition at 31) In our view, however, the validity of the contractual obligation and the culpability of the Exchange under § 6 for Pickard's ultimate demise are separate issues. It is true that if Lank ultimately prevails on the merits of his claim, sums paid by Pickard to the Exchange as a result of the liquidation would appear to be recoverable assets of the corporation, but this is no reason to deny summary judgment here on the initial question of Pickard's contractual obligation, an obligation nowhere seriously contested by Lank.

For the foregoing reasons, summary judgment on the first and second counterclaims is granted as to liability alone. We decline, however, to grant the Exchange's demand for the sum of $227,-007.51 allegedly due. The amount is substantial and the evidence, consisting merely of conclusory affidavits alleging gross debts of $56,712.09 and $170,295.-42 to the Exchange and the Special Trust Fund respectively, is inadequate to support the summary judgment. The agreements do not purport to reimburse the Exchange for every expense incurred, and it remains to be established that

the full amount sought is recoverable. Since the ultimate question of entitlement to these funds does depend on the merit of Lank's action, the execution of the judgment would be stayed in any event pending final determination of Lank's claims.

### V.

██ For its third counterclaim the Exchange seeks damages as a creditor of Pickard against Lank personally for waste of corporate assets in pursuing this litigation. Apart from questions of the propriety of asserting a claim against Lank personally in an action Lank has brought solely in his capacity as Receiver of Pickard, the Exchange's motion for summary judgment on this counterclaim is without merit and must be denied. Lank obtained an order from the Delaware Chancery Court expressly authorizing this suit. (Ex. F, Lank Affidavit, April 21, 1975). Moreover, this issue was fully litigated before the Delaware Court on a subsequent motion by the Exchange to compel Lank to terminate this suit as a waste of assets. (Ex. G, Lank Affidavit, *supra*) The Chancellor held that this action does not constitute waste (*New York Stock Exchange v. Pickard & Company, Inc.*, Civil Action #29997 (Del.Ch., Oct. 9, 1972) (Ex. G, Lank Affidavit, *supra*) and this decision would appear to be *res judicata* on the Exchange's counterclaim. Even if it were not, our decision today that Lank has stated a valid claim against the Exchange precludes the conclusion that the action is so totally devoid of merit as to constitute a waste of assets.

The motion to dismiss for lack of capacity is granted to the extent Lank seeks to recover claims of Pickard's creditors, subordinated lenders and shareholders. Summary judgment is granted on the first and second counterclaims as to liability. In all other respects, the motion is denied.

It is so ordered.